**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO.   22-mj-03095 Goodman

United States of America,

v.

Erich Javier Alfonso Barata,

_____ Defendant. _____/

**CRIMINAL COVER SHEET**

1. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard)? No

2. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to October 3, 2019 (Mag. Judge Jared Strauss)?      No

Respectfully submitted,

JUAN ANTONIO GONZALEZ
UNITED STATES ATTORNEY

BY:   *Eli S. Rubin*
_____
Eli S. Rubin
Assistant United States Attorney
Court ID No.      A5502535
99 N.E. 4th Street
Miami, Florida 33132
Tel: 305-961-9247
Fax: 305-530-6158
Email: Eli.Rubin@usdoj.gov

AO 91 (Rev. 08/09)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
### Southern District of Florida

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| | ) | Case No.  22-mj-03095 Goodman |
| | ) | |
| Erich Javier Alfonso Barata, | ) | |
| | ) | |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____April 6, 2020 through April 23, 2021_____ in the county of _____Miami-Dade_____ in the

_____Southern_____ District of _____Florida_____ , the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 1344 | Bank Fraud |

This criminal complaint is based on these facts:

SEE ATTACHED AFFIDAVIT.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Special Agent David Brant, FDIC-OIG
*Printed name and title*

Attested to by the Applicant in accordance with the requirements of Fed.R.Crim.P. 4.1 by  **Face Time.**

Date: ___06/23/2022___

_____
*Judge's signature*

City and state: _____Miami, Florida_____    Honorable Jonathan Goodman, U.S. Magistrate Judge
*Printed name and title*

<u>**AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT**</u>

I, David Brant, being first duly sworn, hereby depose and state as follows:

<u>**INTRODUCTION AND AGENT BACKGROUND**</u>

1.      I am a Special Agent with the Federal Deposit Insurance Corporation Office of Inspector General ("FDIC-OIG") and have been so since September 2019.  Prior to that, I was a Special Agent with the Internal Revenue Service - Criminal Investigation ("IRS-CI") for approximately ten years.  Throughout the course of my career, I have participated and directed numerous criminal investigations involving identity theft, fraud against the government, bank fraud, and many other illegal schemes affecting the government and financial institutions. Through my training and experience, I am familiar with the tactics, methods, and techniques individuals use to commit various types of fraud and money laundering schemes.

2.      This affidavit is made in support of a criminal complaint charging Erich Javier Alfonso Barata ("ALFONSO") with Bank Fraud in violation of Title 18, United States Code, Section 1344.

3.      This affidavit is based on my personal investigation and investigation by others, including federal law enforcement officials whom I know to be reliable and trustworthy.  The facts contained herein have been obtained by interviewing witnesses and examining documents obtained in the course of the investigation as well as through other means.  This affidavit does not include every fact known to me about this investigation, but rather only those facts sufficient to establish probable cause.

## OVERVIEW OF CERTAIN CARES ACT RELIEF

4.      The Coronavirus Aid, Relief, and Economic Security ("CARES") Act, Pub. L. 116-136, 134 Stat. 281, was a federal law enacted in or around March 2020 designed to provide emergency financial assistance to the millions of Americans who were suffering the economic effects caused by the COVID-19 pandemic.

5.      Two sources of relief provided by the CARES Act were the Paycheck Protection Program ("PPP") and the Economic Injury Disaster Loan ("EIDL") program.

6.      Under the PPP, the CARES Act authorized up to $349 billion in forgivable loans to small businesses for job retention and certain other expenses.  Among other increases in PPP funding, in or around April 2020, Congress authorized over $300 billion in additional PPP funding.

7.      In order to obtain a PPP loan, a qualifying business had to submit a PPP loan application signed by an authorized representative of the business.  The PPP loan application required the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan.  In the PPP loan application, the small business (through its authorized representative) had to state, among other things, its: (a) average monthly payroll expenses; and (b) number of employees.  These figures were used to calculate the amount of money the small business is eligible to receive under the PPP.  In addition, businesses applying for a PPP loan had to provide documentation to the lending institution showing their payroll expenses; typically, businesses would supply documents showing the amount of payroll taxes reported to the Internal Revenue Service ("IRS").

8.      A PPP loan application had to be processed by a participating lender.  If a PPP loan application was approved, the participating lender funded the PPP loan using its own monies, which were 100% guaranteed by the U.S. Small Business Administration ("SBA").  Data from the

application, including information about the borrower, the total amount of the loan, and the listed

number of employees, was transmitted by the lender to the SBA in the course of processing the

loan.

9.      PPP loan proceeds had to be used by the business on certain permissible expenses—

payroll costs, interest on mortgages, rent, and utilities.  The PPP allowed the interest and principal

on the PPP loan to be entirely forgiven if the business spent the loan proceeds on these expense

items within a designated period of time after receiving the proceeds and used a certain amount of

the PPP loan proceeds on payroll expenses.

10.      The EIDL program is an SBA program that provides low-interest financing to small

businesses, renters, and homeowners in regions affected by declared disasters.

11.      The CARES Act authorized the SBA to provide EIDLs of up to $2 million to

eligible small businesses experiencing substantial financial disruption due to the COVID-19

pandemic. In addition, the CARES Act authorized the SBA to issue advances of up to $10,000 to

small businesses within three days of applying for an EIDL. The amount of the advance was

determined by the number of employees the applicant certified having. The advances did not have

to be repaid.  EIDL applications are submitted directly to the SBA and processed by the agency or

designated contractor. In order to obtain an EIDL and advance, a qualifying business had to submit

an application to the SBA and provide information about its operations, such as the number of

employees, gross revenues for the 12-month period preceding the disaster, and cost of goods sold

in the 12-month period preceding the disaster. The applicant must also certify that all of the

information in the application is true and correct to the best of the applicant's knowledge.  EIDL

funds can be used as working capital to make regular payments for operating expenses, including

payroll, rent/mortgage, utilities, and other ordinary business expenses, and to pay business debt

incurred at any time.

12.     EIDL applications were submitted directly to the SBA and processed by the SBA with support from a government contractor.  All EIDL-related payments are processed by the SBA from Denver, Colorado.

## OVERVIEW OF THE FRAUD

13.     ALFONSO applied for, and received, five false and fraudulent PPP and EIDL loans on behalf two Florida-based entities he controlled, Black Hookah Inc. ("Black Hookah") and EJ Networking & Security Service Inc. ("EJ Networking").   In total, ALFONSO received approximately $840,900 in fraud proceeds.

14.     ALFONSO is a resident of Miami-Dade County.

15.     Banks 1 and 2 are financial institutions federally insured by the Federal Deposit Insurance Corporation ("FDIC").  Bank 1 is headquartered in New Jersey.  Bank 2 is headquartered in North Carolina.  Both banks participated in the SBA's PPP as lenders and, as such, were authorized to lend funds to eligible borrowers under the terms of the PPP.

### *Background on Black Hookah*

16.     On approximately February 2, 2017, ALFONSO incorporated Black Hookah under the laws of Florida.  In the company's Articles of Incorporation, ALFONSO was listed as the company's Incorporator and sole officer.

17.     On approximately February 14, 2017, ALFONSO opened an account at Bank 2 in the name of Black Hookah and ending in 2028 ("Account 2028").  He was, and remained, the account's sole signatory.

18.     On approximately September 5, 2017, ALFONSO amended Black Hookah's Articles of Incorporation to add Y.A. as Black Hookah's Vice President.  ALFONSO and Y.A.

have the same listed home address, per Florida's Driver and Vehicle Information Database ("DAVID"), since at least October 2019.

19.     On approximately October 5, 2017, Y.A. opened an account at Bank 1 in the name of Black Hookah and ending in 2761 ("Account 2761").  Y.A. was the account's sole signatory.

### *Background on EJ Networking*

20.     On approximately June 17, 2019, ALFONSO formed EJ Networking under the laws of Florida.  ALFONSO was listed as the entity's Registered Agent and Incorporator.  The company's listed Business Address was ALFONSO's home address, per DAVID.

21.     On approximately March 20, 2020, ALFONSO added Y.A. as Vice President of the company in an Annual Report filed with the Florida Division of Corporations.

22.     On approximately April 7, 2020, as detailed below, the day after ALFONSO learned that Bank 1 was accepting PPP loan applications, ALFONSO and Y.A. opened an account at Bank 1 in the name of EJ Networking.  Y.A. was listed as the Authorized Representative/Signer on the account's "New Business Account" form.  ALFONSO was included as a signatory on the account, which ended in 5176 ("Account 5176").

23.     Two weeks later, approximately April 23, 2020, ALFONSO opened an account at Bank 2 in the name of EJ Networking and ending in 2545 ("Account 2545").  ALFONSO was the account's sole signatory.

### ALFONSO OBTAINED TWO FRAUDULENT
### PPP LOANS ON BEHALF OF BLACK HOOKAH

24.     On approximately April 6, 2020, a Bank 1 employee emailed ALFONSO at E_Alfonso@live.com (the ALFONSO Email Account) to notify him that the bank was "accepting

Customer applications for the SBA Paycheck Protection Program loans through [the bank's] online portal[.]"[1]

25.     On approximately April 10, 2020, ALFONSO caused to be submitted, through Bank 1's online portal, a false and fraudulent PPP loan application on behalf of Black Hookah.

26.     In the loan application, ALFONSO stated that Black Hookah had 22 employees and an average monthly payroll of $158,400.  Although the application listed Y.A. as the company representative, it listed ALFONSO's cell phone number, ending in 7985, as Y.A.'s contact number, and listed one of ALFONSO's email addresses, service@black-hookah.com, as Y.A.'s contact email address.  The display name for this email address, in the Bank 1 employee's email account, was "Erich Alfonso."

27.     The loan application, specifically SBA Form 2483, listed Black Hookah's Business Address as 14992 SW 59th Street in Miami, Florida.  Per records of the Miami-Dade Property Appraiser, this is a single-family home owned by someone with the last name "Alfonso" and believed to be a family member of ALFONSO.

28.     Included in the loan application were six false and fraudulent IRS forms: an IRS Form 940 (Employer's Annual Federal Unemployment (FUTA) Tax Return) for 2019 and five IRS Forms 941 (Employer's Quarterly Federal Tax Return) for the five quarters between January 2019 and March 2020.

---

[1] On May 6, 2021, then Chief United States Magistrate Judge O'Sullivan issued a search warrant for the ALFONSO Email Account.  Warrant by Telephone or Other Reliable Electronic Means, *In the Matter of the Search of Information Associated with E_Alfonso@live.com Stored at Premises Controlled by Microsoft Corporation, USA*, 21-02910-MJ-O'Sullivan (S.D. Fla. May 6, 2021) (SEALED).

29.     The IRS Form 940 stated that Black Hookah had paid $1,900,835.17 to all employees in 2019.  The IRS Forms 941 stated that Black Hookah had 22 employees in each of the preceding five quarters and had spent between $364,320.93 and $475,235.88 on wages, tips, and other compensation every quarter.

30.     These forms were false and fraudulent.  The IRS confirmed that, as of June 16, 2022, it had never received any Form 940s or 941s on behalf of Black Hookah.

31.     The fraudulent nature of these forms is also evidenced by the following: all Florida-based employers are required to report, and pay state employment taxes on, the number of their employees.  At the time of the PPP application, Black Hookah had not even registered to report employment activity, let alone pay any state taxes on any employees.

32.     Nonetheless, Bank 1 approved the application.

33.     On approximately April 17, 2020, ALFONSO, using the ALFONSO Email Account, emailed a Bank 1 employee a copy of the executed promissory note for Black Hookah's PPP loan.

**ALFONSO Laundered the Loan Proceeds**

34.     On approximately April 17, 2020, Bank 1 deposited the proceeds of the PPP loan, $396,000, into Account 2761.

35.     On approximately April 22, 2020, ALFONSO wire transferred $25,000 from Account 2761 to Account 2028—the account for which he was the sole signatory.  The day after the wire transfer, April 23, 2020, ALFONSO withdrew $20,000 in U.S. currency from Account 2028.

36.     On approximately April 27, 2020, ALFONSO wire transferred $356,000 from Account 2761 to Account 2028.  ALFONSO personally requested the wire transfer by using the

ALFONSO Email Account to email a Bank 1 employee and request the transfer.  In total, within ten days of receiving the loan proceeds, ALFONSO wire transferred $381,000 to an account he solely controlled.

37.     In May 2020, ALFONSO issued approximately 65 checks from Account 2028. Each check had "Payroll" displayed in the memo field giving the appearance of a paycheck.  More than half of the checks were issued to ALFONSO (23) or Y.A. (15).  ALFONSO wrote himself and Y.A. multiple purported paychecks for the same purported pay period.  ALFONSO also issued multiple checks to people believed to be family members.

38.     On approximately June 19, 2020, ALFONSO issued a $25,000 check to a Miami-Dade County-based yacht broker.  The memo line stated, "Deps. Sea Ray 44[.]"

### ALFONSO Obtained a Second PPP Loan on Behalf of Black Hookah

39.     On approximately February 12, 2021, ALFONSO caused to be filed a second false and fraudulent PPP loan application on behalf of Black Hookah.  This time, Black Hookah's average monthly payroll was listed as $60,000, with 34 employees.  The application included at least one of the fraudulent IRS forms.

40.     Bank 1 approved the application and deposited $150,000 into Account 2761 on approximately February 24, 2021.  Approximately $137,500 was withdrawn from the account in four round-dollar withdrawals over the subsequent two months.  The last of the four withdrawals occurred April 23, 2021.

### ALFONSO OBTAINED A FRAUDULENT PPP LOAN AND A FRAUDULENT EIDL ON BEHALF OF EJ NETWORKING

41.     ALFONSO also caused to be submitted a false and fraudulent PPP loan application at Bank 1 on behalf EJ Networking.

42.     On approximately April 7, 2020, a PPP loan application on behalf of EJ Networking was filed online with Bank 1.  Y.A. was again listed as the company representative.

43.     The application stated that the company had 15 employees and an average monthly payroll of $95,000.  The application requested a loan in the amount of $237,500.  The application bears Y.A.'s signature.

44.     The application was false and fraudulent.  At the time of the application, EJ Networking had not registered with the Florida Department of Revenue to pay employment taxes, nor had it paid taxes on any employees.  Further, the entity did not have a bank account prior to April 2020—the same month in which ALFONSO learned of the PPP.

45.     Bank 1 approved the application.  On approximately April 20, 2020, Bank 1 deposited the proceeds of the loan, $237,500, into Account 5176.

### ALFONSO Again Laundered the Loan Proceeds

46.     ALFONSO followed the same pattern of transferring the PPP loan proceeds from Bank 1 to Bank 2.  On approximately April 28, 2020, ALFONSO, using the ALFONSO Email Account, emailed a Bank 1 employee requesting to transfer $215,000 from Account 5176 at Bank 1 to Account 2545 at Bank 2.  As noted above, ALFONSO opened Account 2545 just days earlier after receiving the proceeds of the PPP loan.  Bank 1 processed the transfer that day.

47.     ALFONSO proceeded to issue numerous checks with "Payroll" written in the memo line.  Again, many of the checks—sixteen in total, adding up to over $30,000—were issued to ALFONSO and Y.A.  ALFONSO also paid approximately $16,000 to at least two family members.

48.     After issuing two months of fraudulent proceeds, EJ Networking stopped issuing checks completely.

***ALFONSO Obtained a Fraudulent EIDL on Behalf of EJ Networking***

49.     On approximately July 1, 2020, ALFONSO applied for an EIDL on behalf of EJ

Networking.  In the application, ALFONSO listed himself as the sole owner of the company and

included both his phone number and social security number.  He also fraudulently asserted that the

company had 15 employees and a gross revenue for the twelve months prior to January 31, 2020,

of $921,630.  As noted above, ALFONSO only opened a bank account for EJ Networking in April

2020.

50.     The SBA granted ALFONSO's application.   ALFONSO digitally signed the

resulting Loan Authorization and Agreement.   On approximately July 21, 2020, ALFONSO

received the proceeds of the loan, approximately $57,400, into Account 2545.

[remainder of page left blank intentionally]

## CONCLUSION

51.     Based on my training and experience, and the information provided in this affidavit,

I respectfully submit that there is probable cause to believe that:

From on or about April 6, 2020, until approximately April 23, 2021, in the Southern District of Florida and elsewhere, the defendant, ERICH JAVIER ALFONSO BARATA, did knowingly, and with intent to defraud, execute and attempt to execute, and cause the execution of, a scheme and artifice to defraud one or more financial institutions, which scheme and artifice employed a material falsehood, and did knowingly, and with intent to defraud, execute, and attempt to execute, and cause the execution of a scheme and artifice to obtain any of the moneys and funds owned by, and under the custody and control of, Bank 1, by means of false and fraudulent pretenses, representations, and promises relating to a material fact, that is, by causing Bank 1 to deposit at least $783,500 into accounts controlled by the defendant, in violation of Title 18, United States Code, Sections 1344 and 2.

**FURTHER YOUR AFFIANT SAYETH NAUGHT.**

David Brant
Federal Deposit Insurance Corporation
Office of Inspector General
Special Agent

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by Facetime on this __23rd__ day of June, 2022, in Miami, Florida.

HONORABLE JONATHAN GOODMAN
UNITED STATES MAGISTRATE JUDGE

11